UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| LUKE ASH,<br><br>　　　　Plaintiff;<br><br>　　v.<br><br>CITY OF BATON ROUGE, LOUISIANA/PARISH OF EAST BATON ROUGE, SID EDWARDS, in his official capacity as Mayor-President of Baton Rouge, Louisiana, EAST BATON ROUGE PARISH LIBRARY, KATRINA STOKES, in her official capacity as Library Director of the East Baton Rouge Parish Library, the METROPOLITAN COUNCIL OF THE CITY OF EAST BATON ROUGE, BRANDON NOEL, in his official capacity as the Mayor-Pro Tempore of the Metropolitan Council of the City of Baton Rouge, LIBRARY BOARD OF CONTROL OF THE CITY OF EAST BATON ROUGE, and CANDACE TEMPLE, in her official capacity as the President of the Library Board of Control of the City of East Baton Rouge,<br><br>　　　　Defendants. | Case No.<br><br>Demand for Jury Trial |

**VERIFIED COMPLAINT**
**For Reinstatement, Declaratory and Injunctive Relief, and Damages**

For his VERIFIED COMPLAINT for reinstatement, a permanent injunction, declaratory relief, and damages against Defendants, CITY OF BATON ROUGE, LOUISIANA/PARISH EAST BATON ROUGE, SID EDWARDS, in his official

capacity as Mayor-President of Baton Rouge, Louisiana, EAST BATON ROUGE PARISH LIBRARY, KATRINA STOKES, in her official capacity as Library Director of the East Baton Rouge Parish Library, the METROPOLITAN COUNCIL OF THE CITY OF EAST BATON ROUGE, BRANDON NOEL, in his official capacity as the Mayor-Pro Tempore of the Metropolitan Council of the City of Baton Rouge, LIBRARY BOARD OF CONTROL OF THE CITY OF EAST BATON ROUGE, AND CANDACE TEMPLE, in her official capacity as the President of the Library Board of Control of the City of East Baton Rouge (collectively "Defendants"), Plaintiff LUKE ASH, alleges and avers as follows:

## NATURE OF THE ACTION

1. Prior to the unlawful, unconstitutional, and wrongful termination alleged herein, Plaintiff Luke Ash ("Plaintiff" or "Ash") served as a Library Technician I at the East Baton Rouge Parish Library ("Library"). Ash also served and continues to serve as a Christian minister and the pastor of Stevendale Baptist Church ("Stevendale") in Baton Rouge, Louisiana.

2. Ash has sincerely held religious beliefs that God created mankind in his own image, and that each individual is created either male or female. *See Genesis* 1:27 ("male and female He created them" (NIV)); *Matthew* 19:4 ("[A]t the beginning the Creator made them male and female." (NIV)). Ash also has sincerely held religious beliefs that biological sex is immutable. *See Psalm* 139:13 ("For You formed my inward parts. You covered me in my mother's womb." (NKJV)); *Jeremiah* 1:5 ("Before I formed you in the womb, I knew you."). Because of his sincerely held religious beliefs, Ash has sincere religious convictions and beliefs that referring to a

2

person by pronouns inconsistent with their biological sex both dishonors God's design for that person and constitutes a lie and a grave sin. *See Exodus* 20:16 ("You shall not give false testimony." (NIV)). Indeed, Ash believes that to tell such a lie and be complicit in such lies is a return to his sinful flesh, rather than the redeemed nature he was given by God. *See Colossians* 3:9 ("Do not lie to each other, since you have taken off your old self with its practices." (NIV)); *Leviticus* 19:11 ("Do not lie. Do not deceive one another." (NIV)). Further, and critically, Ash believes that for him to participate in knowing and blatant lies concerning God's design for male and female is detestable to God and renders him subject to judgment. *Proverbs* 12:22 ("The Lord detests lying lips, but he delights in people who are trustworthy." (NIV)). More to the point, Ash believes that he is compelled to tell the truth, even to those who may disagree. *See Zechariah* 8:16 ("Speak the truth to each other." (NIV)).

3.      Ash's sincerely held religious beliefs ran into direct conflict with Defendants' employment requirement that all employees of the Library refer to individuals by their chosen, rather than biologically and chromosomally accurate, pronouns. Defendants' employment requirement was known as the Inclusivity Policy.

4.      Ash first encountered this conflict when a co-worker informed him that their female colleague purportedly claimed to be a male and wanted to be recognized as such. The co-worker asked Ash whether he would refer to her by male pronouns. In accordance with his sincerely held religious belief, Ash informed the colleague that his beliefs and convictions compelled him to abstain from participating in a lie but that he would certainly be respectful of all coworkers regardless of their preferences.

3

This, too, is a sincerely held religious belief that Ash is compelled to abide by in his life. *I Peter* 2:17 ("Show proper respect to everyone." (NIV)); *Philippians* 2:5 ("In your relationships with one another, have the same mindset as Christ Jesus." (NIV)).

5.     Ash's co-worker apparently informed Library officials of Ash's comments, and Ash was summoned to his supervisor's office the following day to give an account concerning his statement. Library administrators specifically asked Ash whether he would use pronouns chosen by an individual, even if inconsistent with that individual's biological and chromosomal reality. Ash informed the Library officials of his beliefs that to do so would be a lie and that he could not do so.

6.     The very next day, Defendants signed a letter terminating Ash's employment and delivered it to him the following morning. In no uncertain terms, the Library made clear to Ash that he was being terminated because of his refusal to use preferred pronouns and nothing more.

## PARTIES

7.     Plaintiff, Luke Ash, is a Christian and pastor who served as a Library Technician I at the East Baton Rouge Parish Library from March 21, 2025, to July 10, 2025, until his employment was terminated as a result of Defendants' unlawful policies, practices, and actions.

8.     Defendant, City of East Baton Rouge/Parish of East Baton Rouge ("Baton Rouge"), is a consolidated governmental entity responsible for the operation of city and parish functions, including the East Baton Rouge Parish Library, with the authority under state and federal law to sue and be sued. Baton Rouge is directly

4

responsible for the Library Board of Control and is responsible for its policies, practices, and actions. Baton Rouge is an "employer" within the meaning of Title VII, 42 U.S.C. §2000e(b), in that it has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

9.     Defendant, Sid Edwards, is Mayor-President of Baton Rouge and has ultimate authority over and responsibility for the policies, practices, and actions of Baton Rouge and its agencies and department, including the East Baton Rouge Parish Library. Edwards is sued in his official capacity.

10.     Defendant, East Baton Rouge Parish Library ("Library"), is a government agency with authority to sue and be sued. The Library employed, supervised, and terminated Mr. Ash. The Library is an "employer" within the meaning of Title VII, 42 U.S.C. §2000e(b), in that it has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

11.     Defendant, Katrina Stokes, is the Director of the East Baton Rouge Parish Library and is responsible for overseeing, implementing, and executing all policies, practices, and actions of the Library, including the Inclusivity Policy at issue herein. Ms. Stokes was Plaintiff's supervisor and was directly responsible for, and signed, his termination letter. Stokes is sued in her official capacity.

12.     Defendant, Metropolitan Council of the City of Baton Rouge/Parish of East Baton Rouge ("Council"), is the governing body of Baton Rouge with authority to sue and be sued, and exercises all legislative powers, functions, and duties of Baton

Rouge, including the development, adoption, amendment, and implementation of policies and practice in Baton Rouge. The Council appoints members of the Library Board, which oversees the East Baton Rouge Parish Library.

13. Defendant, Brandon Noel, is the Mayor-Pro Tempore of the Metropolitan Council of the City of Baton Rouge/Parish of East Baton Rouge ("Council"), which is the governing body of Baton Rouge with authority to sue and be sued, and exercises all legislative powers, functions, and duties of Baton Rouge, including the development, adoption, amendment, and implementation of policies and practice in Baton Rouge. The Council appoints members of the Library Board, which oversees the East Baton Rouge Parish Library. Defendant Noel is sued in his official capacity.

14. Defendant, Library Board of Control of the City of East Baton Rouge ("Library Board"), is the governing body, with authority to sue and be sued, responsible for establishing, maintaining, and overseeing the East Baton Rouge Parish Library, is responsible for proposing, reviewing, adopting, implementing, amending, and executing Library policies, practices, and actions, including the Inclusivity Policy at issue herein.

15. Defendant, Candace Temple, is the President of the Library Board of Control of the City of East Baton Rouge ("Library Board"), which is the governing body, with authority to sue and be sued, responsible for establishing, maintaining, and overseeing the East Baton Rouge Parish Library, is responsible for proposing, reviewing, adopting, implementing, amending, and executing Library policies,

practices, and actions, including the Inclusivity Policy at issue herein. Defendant Temple is sued in her official capacity.

## JURISDICTION AND VENUE

16.    This action arises under the Constitution and the laws of the United States, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, and the First and Fourteenth Amendments to the United States Constitution.

17.    This action is brought pursuant to 42 U.S.C. §1983 and 42 U.S.C. §2000e-5(b), (f).

18.    This Court has jurisdiction over this action under 28 U.S.C. §1331, §1343, and 42 U.S.C. §2000e-5(f).

19.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) and 42 U.S.C. §2000e-5(f) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

20.    This Court is authorized to grant Plaintiff's prayer for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§2201-2202, implemented through Federal Rule of Civil Procedure 57, and to grant Plaintiff's prayer for injunctive relief under 42 U.S.C. §2000e-5(g)(1), 28 U.S.C. §2202, and Fed. R. Civ. P. 65.

21.    This Court is authorized to grant Plaintiff's prayer for damages pursuant to 42 U.S.C. §1983 and 42 U.S.C. §2000e-5(g), and to grant Plaintiff's prayer for costs, expenses, and reasonable attorney's fees pursuant to Fed. R. Civ. P. 54, 42 U.S.C. §2000e-5(k), and 42 U.S.C. §1988.

22. This Court is also authorized to grant Plaintiff's prayer for relief, including damages, reasonable attorney's fees, costs, and expenses, pursuant to Louisiana Revised Statute 13:5237.

23. Plaintiff has exhausted all required administrative remedies by timely filing a charge of discrimination with the Equal Employment Opportunity Commission on November 3, 2025, and requesting a notice of right to sue. On June 10, 2026, Plaintiff received his Notice of Right to Sue from the EEOC. A true and correct copy of that Notice is attached hereto as EXHIBIT A and incorporated herein.

## FACTUAL ALLEGATIONS

### A.    Plaintiff Luke Ash and His Sincerely Held Religious Beliefs.

24. On March 21, 2025, Ash began his employment as a Library Technician I at the Library.

25. Many of Ash's co-workers and supervisors, including his direct supervisor, knew that that Ash was a Christian with sincerely held religious beliefs in the Bible.

26. Ash is also a bi-vocational pastor, and works a full-time job to fund his calling as a minister. Ash has sincerely held religious beliefs that to do so is a gift to those who receive his ministry without burden. *See 1 Thessalonians* 2:9 ("We worked night and day in order not to be a burden to anyone while we preached the Gospel of God to you." (NIV)).

27. Ash did not hide his faith or his sincerely held religious beliefs. During his breaks or at downtime at work when he was otherwise permitted to do so, Ash would read his Bible and prepare sermons.

28. Ash was not quiet about his sincere religious convictions and often discussed the Bible, Christianity, and his church with co-workers, including openly with one co-worker who, at one time, attended Ash's church.

29. Additionally, Ash and one of his co-workers openly discussed that both of their children attended Vacation Bible School at a local church in Baton Rouge, and how Ash knew the pastor of the church where the children had attended Vacation Bible School together.

30. Ash also discussed openly with his co-worker that the co-worker's in-laws were regularly taking his children to church he did not attend.

31. Ash also noticed that his fellow employees would make specific efforts not swear around him or use foul language in his presence, with one co-worker even apologizing to Ash for swearing in front of him. Ash believes that his colleagues would not curse in front of him because of his Christian beliefs and their knowledge of his role as a pastor.

32. Ash holds sincere religious beliefs, including that God created each person male and female, that biological sex is immutable, and that he must speak truthfully in accordance with those beliefs. Luke strives to live consistently with these principles in all aspects of his life, including in the workplace.

9

33.    Ash sincerely believes that God created each person uniquely as either male or female, and his belief is based on *inter alia Genesis* 1:27 ("So God created mankind in his own image, in the image of God he created them; male and female he created them." (NIV)), and *Mark* 10:6 ("But at the beginning of creation God 'made them male and female.'" (NIV)). Scripture presents these two distinct and complementary sexes as reflective of the image of God.

34.    Ash also sincerely believes in Scripture's teaching in that the Bible's design for marriage demonstrates the unique and complementary creation of male and female. *See Genesis* 2:18 ("The Lord GOD said, 'It is not good for the man to be alone. I will make a helper suitable for him.'" (NIV)); *Genesis* 2:24 ("That is why a man leaves his father and mother and is united to his wife, and they become one flesh." (NIV)).

35.    Ash also holds sincere religious beliefs that Christians are not to bear false witness. *Exodus* 20:16 ("You shall not give false testimony against your neighbor." (NIV)); *Leviticus* 19:11 ("Do not lie. Do not deceive one another." (NIV)).

36.    Ash believes that for him to participate in knowing and blatant lies concerning God's design for male and female is detestable to God and renders him subject to judgment. *Proverbs* 12:22 ("The Lord detests lying lips, but he delights in people who are trustworthy." (NIV)). More to the point, Ash believes that he is compelled to tell the truth, even to those who may disagree. *See Zechariah* 8:16 ("Speak the truth to each other." (NIV)).

37.    Ash also sincerely believes in the Bible's teaching that the only permissible form of deception is that against enemies, and such deception is seen as an act of war. Ash does not view his co-workers as enemies and instead strives to treat them with respect, which his sincerely held religious belief also compel him to view as a requirement of Scripture based on *inter alia I Peter* 2:17 ("Show proper respect to everyone." (NIV)); and *Philippians* 2:5 ("In your relationships with one another, have the same mindset as Christ Jesus." (NIV)).

38.    Ash believes that to tell such a lie and be complicit in such lies is a return to his sinful flesh, rather than the redeemed nature he was given by God. *See Colossians* 3:9 ("Do not lie to each other, since you have taken off your old self with its practices." (NIV)); *Leviticus* 19:11 ("Do not lie. Do not deceive one another." (NIV)). Further, and critically, Ash believes that for him to participate in knowing and blatant lies concerning God's design for male and female is detestable to God and renders him subject to judgment. *Proverbs* 12:22 ("The Lord detests lying lips, but he delights in people who are trustworthy." (NIV)). More to the point, Ash believes that he is compelled to tell the truth, even to those who may disagree. *See Zechariah* 8:16 ("Speak the truth to each other." (NIV)).

39.    Based on these sincerely held religious beliefs compelled by Ash's beliefs in Scripture, Ash's sincerely held religious beliefs ran into direct conflict with Defendants' employment requirement that all employees of the Library refer to individuals by their chosen, rather than biologically and chromosomally accurate, pronouns. Defendants' employment requirement was known as the Inclusivity Policy.

11

**B.    Defendants' Unconstitutional Inclusivity Policy.**

40.    Defendants have adopted, maintained, and require as a condition of employment that all employees of the Library abide by the so-called Inclusivity Policy. A true and correct copy of the Inclusivity Policy is attached hereto as EXHIBIT B and incorporated herein.

41.    The Inclusivity Policy states, in full:

The East Baron Rouge Parish Library values equity, diversity, and inclusion for employees. It is Library policy to provide and maintain an environment conducive to the safety and well-being of its employees, free of harassment, bullying, intimidation and bias of any kind.

There are numerous guarantees within the Constitution and laws of our nation and state that guarantee equality to all people. Library policy and philosophy uphold all of these guarantees. Furthermore, the Library provides an atmosphere in which all employees are welcomed, accepted and respected, regardless of age, gender identity or expression, race, social, economic, and ethnic background, sexual preference, religious preference, and any other distinguishing characteristic.

Their respect and acceptance can be destroyed by thoughtless or careless expressions of opinion, derogatory words, name-calling, and any number of other actions and gestures, whether consciously or unconsciously and regardless of degree. All employees are expected to speak and act appropriately while at work, both in public areas in view of patrons and in the privacy of work areas.

All employees have the right to:

- Be addressed by their chosen name and pronouns.
- Dress in a manner consistent with their gender identity and expression.
- Decide if, when, how, and with whom to share personal information regarding gender identity, gender expression, medical history, and any other confidential information.

We must all work to recognize the value of our colleagues and give them the respect and support each of us needs to live and thrive

(Exhibit B, at 1.)

### C.    Defendants' Termination of Ash for His Religious Beliefs.

42.    On July 7, 2025, in the course of a conversation with a co-worker, Ash was informed that a female trainee at the Library preferred to identify as a male, despite being a biological and chromosomal female.

43.    One of Ash's co-workers informed him that he should refer to the trainee as a "he," rather than using the pronouns "she."

44.    Specifically, Ash's co-worker informed him that he was required to use the preferred pronouns of an individual at the Library.

45.    The trainee who Ash was told identified as a gender different than their biological and chromosomal reality never told Ash that he was using incorrect pronouns, never identified herself as male, and did not ask Ash to refer to her as anything different.

46.    Rather, one of Ash's co-workers told him independently, that he was required to refer to the trainee as the preferred pronoun that the co-worker proffered was correct, and asked him whether he would begin to comply with the so-called Inclusivity Policy.

47.    Ash responded to his co-worker that he could not engage in such false testimony. After some sarcastic remarks from his co-worker, Ash respectfully removed himself from the conversation.

48.    Ash's comment to his co-worker that he could not abide by such lies and could not himself lie about biological and chromosomal reality were based on his sincerely held religious beliefs discussed *supra*.

49.     The following day, July 8, 2025, Ash was called into a meeting with the Head of Reference for the Library and three of his supervisors to discuss what the co-worker had told them about her conversation with Ash.

50.     Ash was reprimanded for failure to comply with the so-called Inclusivity Policy.

51.     In that meeting, Ash was asked by his supervisors whether he would begin complying with the so-called Inclusivity Policy by using the preferred pronouns of those with whom he interacted.

52.     Ash informed his supervisors at the Library that he could not do so because to comply with such a requirement would require him to lie.

53.     Ash's preference would be to refer to individuals respectfully by their names and pronouns consistent with their biological and chromosomal reality and not be required to violate his convictions by telling a lie that places him in danger of judgment for such a sin.

54.     Ash's beliefs about not being able to comply with the Inclusivity Policy are based on his sincerely held religious beliefs discussed *supra*.

55.     Permitting Ash to maintain respectful communications to those with whom he interacts at the Library while maintaining compliance with his sincerely held religious beliefs would have been a reasonable accommodation that would impose no hardship whatsoever on the Defendants or the Library.

56.     Because Ash made his sincere convictions about telling a lie known to his employers and supervisors, Defendants were put on actual notice of a conflict

14

between Defendants' Inclusivity Policy and Ash's sincerely held religious beliefs and of Ash's need for accommodation.

57.    Even if Defendants did not have actual notice of Ash's need for an accommodation, which they did, they certainly had more than an "unsubstantiated suspicion" that an accommodation was needed. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015) ("an employer who acts with the motive of avoiding accommodation may violate Title VII even if he has no more than unsubstantiated suspicion that accommodation would be needed.").

58.    Despite the comment of his co-worker and the criticism and rebuke he received at the July 8th meeting with his supervisors, Ash had never, at any point, referred to any co-worker directly using pronouns inconsistent with their preference, and he had certainly never done so after being told by such individual that the pronoun he used was incorrect.

59.    Immediately following the July 8 meeting, Ash engaged in an hour-long conversation with one of the three supervisors present regarding his concern that the Library was attempting to compel him to say something that violated his religious beliefs. During the discussion, Ash referenced scenes from the novel *1984* as well as the teachings and writings of the late Christian theologian C.S. Lewis.

60.    On July 10, 2025, Ash was informed that he was being terminated because it was "not working out for the work culture." In other words, despite knowing that Ash had religious beliefs that required non-burdensome

accommodation from the Inclusivity Policy, Ash was informed that his religious beliefs were incompatible with employment at the Library.

61. Ash was provided a termination letter on July 10, 2025 confirming that his employment was terminated for refusal to comply with the Inclusivity Policy. A true and correct copy of the July 9 Termination Letter is attached hereto as EXHIBIT C and incorporated herein.

62. Specifically, the Termination Letter informed Ash that "it has been determined that you have not met the standards as acceptable by the East Baton Rouge Parish Library System." (Exhibit C at 1.)

63. In other words, Ash was specifically told both in person and by official termination letter that his sincerely held religious beliefs and the need for an accommodation from the so-called Inclusivity Policy were not acceptable to Defendants, and he was terminated because of his beliefs and need of accommodation.

64. Immediately upon receiving the Termination Letter, Ash was unceremoniously instructed to gather his belongings and leave immediately.

65. Though the Termination Letter did not specifically mention that Inclusivity Policy in its description, which is not surprising since employers rarely disclose voluntarily their intent to discriminate, Ash's supervisor told him that the Library had to "follow the Inclusivity Policy" and that Ash's religious beliefs about the "pronoun thing" were not acceptable to the Library.

66. Despite knowing that Ash's sincere religious beliefs conflicted with a Library employment requirement, specifically the so-called Inclusivity Policy,

16

Defendants neither engaged nor requested to engage in any interactive accommodation process.

67. Despite knowing that Ash's sincere religious beliefs conflicted with a Library employment requirement, specifically the so-called Inclusivity Policy, Defendants failed to provide Ash with any reasonable accommodation.

68. Despite knowing that Ash's sincere religious beliefs conflicted with a Library employment requirement, specifically the so-called Inclusivity Policy, Defendants immediately terminated Ash for his religious beliefs and their purported nonconformity with "standards as acceptable" to the Library. (Exhibit C at 1.)

## CLAIMS FOR RELIEF

### COUNT I
VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE
UNITED STATES CONSTITUTION
**Retaliation**

69. Plaintiff re-alleges and incorporates by reference each allegation set forth in paragraphs 1-68.

70. The Free Speech Clause of the First Amendment, as applied to the States through the Fourteenth Amendment, prohibits Defendants from abridging Plaintiff's freedom of speech.

71. Defendants violated that protection, and retaliated against Plaintiff, by taking adverse employment action against him because of his speech regarding the use of pronouns inconsistent with biological and chromosomal reality.

17

72. To establish a claim under 42 U.S.C. §1983 for First Amendment retaliation related to an employee's speech, Plaintiff must show: "(1) he suffered an adverse employment action, (2) he spoke as a citizen on a matter of public concern, (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, and (4) the speech precipitated the adverse employment action." *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007) (cleaned up).

73. Plaintiff's termination from employment constitutes adverse employment action.

74. Plaintiff spoke as a citizen on a matter of public concern.

75. Plaintiff's comments and discussion with his employer and supervisors constitute an expression of his sincerely held religious beliefs about the use of pronouns inconsistent with biological and chromosomal reality is a matter of public concern because it addressed a "matter of political, social, or other concern to the community," *Connick v. Myers*, 461 U.S. 138, 147–48 (1983), and "taken in context, his speech concerns a struggle over the social control of language in a crucial debate about the nature and foundation, or indeed the real existence, or the sexes." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (cleaned up).

76. Indeed, Plaintiff's speech "reflected his own conviction that one's sex cannot be changed, a topic which has been in the news on many occasions and has become and issue of contentious political debate." *Id.* (cleaned up).

77. "If there's one thing that everyone agrees on here, it's that pronouns matter. Pronouns can and do convey a powerful message implicating a sensitive topic

18

of public concern." *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 768 (6th Cir. 2025) (Thapar and Nalbandian, J., concurring) (quoting *Meriwether*, 992 F.3d at 508)); *see also Janus v. AFSCME*, 585 U.S. 878, 913-14 (2018) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("[S]exual orientation and gender identity … are sensitive political topics, and they are undoubtedly matters of profound value and concern to the public.") (cleaned up). "The battle of the pronouns is a matter of serious political and social concern." *Defending Educ.*, 158 F.4th at 768 (Thapar and Nalbandian, J., concurring), "Such speech is 'at the heart of the First Amendment's protection.'" *Id.* (quoting *Snyder*, 562 U.S. at 451-52).

78.   Plaintiff's interest in speech consistent with his sincere religious convictions, a matter plainly protected by federal law, outweighs any governmental interest.

79.   Plaintiff's speech did not disrupt Library operations or interfere with working relationships.

80.   Plaintiff's speech directly precipitated his termination, and Defendants admitted that his termination was motivated by his religious beliefs and speech.

81.   Plaintiff's speech was therefore the but-for cause of Defendants' adverse employment action against him and his termination.

82.   Defendants' actions would deter a person of ordinary firmness from engaging in similar protected speech.

83.    Defendants' retaliatory and unconstitutional actions violated Plaintiff's right to free speech as guaranteed by the First Amendment to the United States Constitution.

84.    As a direct and proximate result of Defendants' unconstitutional policies, practices, and actions, Plaintiff has suffered, is suffering, and will continue to suffer irreparable harm, including the loss of his First Amendment rights.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

## COUNT II
### VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
**Compelled Speech**

85.    Plaintiff re-alleges and incorporates by reference each allegation set forth in paragraphs 1-68.

86.    The First Amendment protection the right to speak and not to speak the government's preferred message. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all.").

87.    Indeed, "[s]ome of th[e] Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 61 (2006). Indeed, "no official—high or petty—may command our tongues or silence our voices." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (cleaned up).

20

88.     To state a claim for compelled speech under the First Amendment, a plaintiff must show that there is speech to which he objects that is compelled by some government action. *E.g.*, *Nelson v. Landry*, 714 F. Supp. 3d 790, 799 (M.D. La. 2024); *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015).

89.     Defendants' Inclusivity Policy, both on its face and as applied, compels Plaintiff to speak specific words relating to a person's preferred pronouns.

90.     Specifically, on its face and as applied, Defendants' Inclusivity Policy requires Plaintiff to "address" all individuals "by their chosen name and pronouns" (Exhibit C at 1), regardless of his sincere religious convictions to the contrary.

91.     Plaintiff made his objections and need for an accommodation from the Inclusivity Policy known to Defendants and specifically noted that he objected to speaking the government's chosen message.

92.     Defendants' Inclusivity Policy, on its face and as applied, plainly compels a specific message because it threatens punishment, consequences, and the threat of punishment and consequences for failure to speak the government's message, and therefore deters the exercise of First Amendment rights.

93.     Defendants' Inclusivity Policy, on its face and as applied, deters First Amendment protected speech in more than any minimal or subjective manner, but results in significant adverse action against employees who fail to abide by and speak the government's preferred message.

94.     Defendants' Inclusivity Policy, on its face and as applied, also prohibits Plaintiff from refraining from speaking the government's preferred message.

95.    Defendants' Inclusivity Policy, on its face and as applied, is not supported by any compelling, legitimate, substantial, or even rational government interest.

96.    Defendants' Inclusivity Policy, on its face and as applied, is not the least restrictive means of achieving an otherwise permissible government interest.

97.    Defendants' Inclusivity Policy, on its face and as applied, is not narrowly tailored to achieve any such legitimate interest, even if it existed.

98.    Defendants' Inclusivity Policy, on its face and as applied, lacks any rational basis and is irrational and unjustifiable.

99.    Defendants' Inclusivity Policy, on its face and as applied, is arbitrary and unconscionable.

100.    Defendants' Inclusivity Policy, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Plaintiff's sincerely held religious beliefs and speech.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in his prayer for relief.

## COUNT III
### VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
**Content and Viewpoint Discrimination**

101.    Plaintiff re-alleges and incorporates by reference each allegation set forth in paragraphs 1-68.

102. The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiff's freedom of speech.

103. The Free Speech Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the state from excluding Plaintiff from government programs and positions based on his religion, and such "exclusion constitutes viewpoint discrimination." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001). Indeed, "[v]iewpoint discrimination, as we have put it, represents an egregious form of content regulation, and governments in this country must nearly always abstain from it." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (cleaned up).

104. "It's a sad fact of modern life in America that the culture wars are no longer limited to skirmishes between elected officials on Capitol Hill or in our state capitals." *Oliver v. Arnold*, 19 F.4th 843, 843 (5th Cir. 2021) (Ho, J., concurring in denial of rehearing en banc). Disputes over the use of transgender pronouns are among those conflicts. *Id.* ("Others forbid students from using biological pronouns and other terms that 'invalidate' a person's gender identity – notwithstanding the widely-held view that biological pronouns invalidate no one, but are dictated by science, faith, grammar, or tradition.").

105. Defendants' Inclusivity Policy, on its face and as applied, unconstitutionally discriminates on the basis of a speaker's content and viewpoint.

23

106. Defendants' Inclusivity Policy, on its face and as applied, compels speech and prohibits silence on the basis of a speaker's content and viewpoint.

107. Defendants' Inclusivity Policy, on its face and as applied, singled out Plaintiff solely because of his religious beliefs and speech, and subjected him to punishment and termination solely on the basis of his religious speech and viewpoint.

108. Defendants' Inclusivity Policy, on its face and as applied, is not supported by any compelling, legitimate, substantial, or even rational government interest.

109. Defendants' Inclusivity Policy, on its face and as applied, is not the least restrictive means of achieving an otherwise permissible government interest.

110. Defendants' Inclusivity Policy, on its face and as applied, is not narrowly tailored to achieve any such legitimate interest, even if it existed.

111. Defendants' Inclusivity Policy, on its face and as applied, lacks any rational basis and is irrational and unjustifiable.

112. Defendants' Inclusivity Policy, on its face and as applied, is arbitrary and unconscionable.

113. Defendants' Inclusivity Policy, on its face and as applied, has caused, is causing, and will continue to cause Plaintiff to suffer irreparable harm, including the loss of his First Amendment rights.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT IV
### VIOLATION OF TITLE VII, 42 U.S.C. §2000e-2
### Religious Discrimination – Disparate Treatment

114.    Plaintiff re-alleges and incorporates by reference each allegation set forth in paragraphs 1-68.

115.    Title VII prohibits discrimination against employees on the basis of religion. 42 U.S.C. §2000e-2(a) ("It shall be an unlawful employment practice for an employer … to fail or refuse to hire or to discharge any individual, otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin….").

116.    Title VII defines the protected category of religion to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. §2000e(j).

117.    Defendants employ more than 15 employees and are thus subject to Title VII's prohibitions.

118.    Plaintiff holds sincere religious beliefs, articulated more fully *supra* and expressly incorporated herein, that preclude him from referring to co-workers with pronouns inconsistent with their biological and chromosomal reality.

119.    Defendants had actual knowledge, actual notice, and were plainly aware of Plaintiff's religious beliefs.

120.    Defendants had actual knowledge, actual notice, and were plainly aware of Plaintiff's need for an accommodation from their Inclusivity Policy.

121. Plaintiff specifically made Defendants aware of his need for an accommodation from the Inclusivity Policy on the basis of his sincere religious beliefs and that he had a direct conflict with the Inclusivity Policy's requirement that he commit what his religious beliefs compel him to view as sin and a violation of Scripture.

122. Even if Defendants did not have actual notice of Plaintiff's need for an accommodation, which they did, they certainly had more than an "unsubstantiated suspicion" that an accommodation was needed. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015) ("an employer who acts with the motive of avoiding accommodation may violate Title VII even if he has no more than unsubstantiated suspicion that accommodation would be needed.").

123. The crucial question is whether the employee's need for an accommodation was a motivating factor in the employer's employment decision. *Abercrombie & Fitch Stores*, 575 U.S. at 772.

124. Defendants terminated Plaintiff on the basis of his need for an accommodation of his sincere religious beliefs and made his need for such accommodation the motivating factor in their decision to terminate his employment.

125. Plaintiff specifically informing his supervisors that he was unable to use pronouns inconsistent with biological and chromosomal reality and that he could not comply with the requirement.

126. Plaintiff was and is not required to use any magic words or phrases, or even the terminology "religious accommodation" in his request, but merely to put his employer on notice of his need for accommodation, which he did.

127. Defendants made their decision to terminate Plaintiff on the basis of his articulated conflict with an employment requirement, specifically the Inclusivity Policy, and did so despite their lawful requirement to accommodate his beliefs.

128. Defendants failed to engage in the interactive accommodation process contemplated by Title VII.

129. Defendants could have accommodated Plaintiff without undue hardship to itself or anyone.

130. Defendants' purported interest in preferring one ideological position on the pronoun issue and animosity towards Plaintiff's religious views on the matter are not and cannot constitute an undue hardship. *Groff*, 600 U.S. at 472 ("An employer who fails to provide an accommodation has a defense only if the hardship is 'undue,' and a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'").

131. The Inclusivity Policy, on its face and as applied, required Plaintiff choose between employment and adherence to his sincerely held religious beliefs.

132. "[T]he rule for disparate-treatment claims based on failure to accommodate a religious practice is straightforward: An employer may not make an

applicant's religious practice, confirmed or otherwise, a factor in employment decisions." *Abercrombie & Fitch Stores*, 575 U.S. at 773.

133. Defendants terminated Plaintiff solely on the basis of his articulated religious beliefs and need for an accommodation. It was thus the sole motivating factor in their termination of his employment.

134. Defendants admitted the Plaintiff's religious beliefs and need for an accommodation was the basis and motivation for their termination of his employment.

135. Defendants' refusal to accommodate Luke's religious beliefs was intentional, deliberate, willful, malicious, reckless, and done with callous disregard for Plaintiff's rights under Title VII.

136. As a result of Defendants' policies and actions, Plaintiff has suffered, is suffering, and will continue to suffer actual damages, including lost earnings, lost benefits, and other financial loss.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT V
### VIOLATION OF THE LOUISIANA PRESERVATION OF RELIGIOUS FREEDOM ACT (PRFA)
### Louisiana Revised Statute §13:5233 – Religious Discrimination

137. Plaintiff re-alleges and incorporates by reference each allegation set forth in paragraphs 1-68.

138. The Louisiana legislature has found and declared that "[t]he free exercise of religion is a fundamental right of the highest order in this state."

139.    Louisiana's Preservation of Religious Freedom Act (PRFA) provides that:

(A) Government shall not substantially burden a person's exercise of religion, even if the burden results from a facially neutral rule or a rule of general applicability, unless it demonstrates that application of the burden to the person is both:
    (1) In furtherance of a compelling governmental interest.
    (2) The least restrictive means of furthering that compelling government interest.

La. R.S. §13:5233(A).

140.    The PRFA defines a "burden" as any direct or indirect action by the government that:

(a) Constrains or inhibits conduct or expression mandated by a person's sincerely held religious tenet or belief.
(b) Significantly curtails a person's ability to express adherence to the person's religious faith.
(c) Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion.
(d) Compels conduct or expression which violates a tenet or belief of a person's religious faith.

La. R.S. §13:5234(2)(a)-(d).

141.    PRFA defines "compelling state interest" as "a government interest of the highest magnitude that cannot otherwise be achieved without burdening a person's right to the free exercise of religion and includes the interest of the state to protect the best interest of a child and the health, safety, and welfare of a child." La. R.S. §13:5234(3).

142.    PRFA defines "demonstrates" as "meeting the burdens of going forward with evidence and persuasion." La. R.S. §13:5234(4).

143.    PRFA defines "exercise of religion" as:

29

[T]he practice or observance of religion under Article I, Section 8 of the Constitution of Louisiana and the First Amendment of the Constitution of the United States of America and includes the ability to act or refuse to act in a manner substantially motivated by a sincerely-held religious belief, whether or not the exercise is compulsory or a central part or central requirement of the person's religious belief and includes the freedom of worship in churches or other places of worship under Article XII, Section 17 of the Constitution of Louisiana.

La. R.S. §13:5234(5).

144.   PRFA defines "government," "governmental agency," and "agency" as:

(a) Any board, commission, court, department, agency, special district, authority, or other entity of the state.
(b) Any political subdivision of this state including parish, municipality, special district, school board, sheriff, public board, institution, department, commission, district, corporation, agency, court, or authority.
(c) Any other public or governmental body of any kind which is not a state agency.
(d) Any official or other person acting under color of law.

La. R.S. §13:5234(6).

145.   PRFA provides that, whenever the government substantially burdens a person's free exercise of religion, the government bears the burden of demonstrating that its action (1) furthers a compelling government interest and (2) is the least restrictive means of achieving that interest. La. R.S. §13:5233(A).

146.   PRFA applies to Defendants, who qualify as "government" within the meaning of La. R.S. §13:5234(6).

30

147. PRFA reflects Louisiana's commitment to the protections afforded religious exercise and the strict scrutiny standard from *Sherbert v. Verner*, 374 U.S. 398 (1963). The legislature has expressly declared that that the Supreme Court's decision in *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) does not define the State's standard for religious exercise claims. La. R.S. §13:5232

148. Federal Religious Freedom Restoration Act precedent is instructive in interpreting PRFA's protections. RFRA is "a kind of super statute, displacing the normal operation of other federal laws[.]" *Bostock v. Clayton Cnty. Ga.*, 590 U.S. 644, 682 (2020). Congress enacted RFRA "to provide very broad protection for religious liberty," extending "far beyond what [the Supreme Court] has held is constitutionally required" under the First Amendment. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014).

149. On October 17, 2025, Plaintiff provided Defendants written notice that he believes: (1) he was unlawfully terminated for his religious beliefs, and (2) the Inclusivity Policy's compelled speech required violated PRFA.

150. Plaintiff requested that the Library revise the Inclusivity Policy to comply with PRFA and that he be reinstated.

151. Plaintiff's notice was emailed to Defendant Stokes on June 3, 2026, and sent to her through certified mail on June 4, 2026. Defendants did not respond, and the Inclusivity Policy remains unchanged.

152. Plaintiff's religious beliefs prevent him from referring to co-workers by pronouns inconsistent with their biological and chromosomal reality, as articulated *supra* in his allegations concerning his religious beliefs.

153. Defendants' Inclusivity Policy, on its face and as applied, impermissibly burdens Plaintiff's sincerely held religious beliefs, compels Plaintiff to either change those beliefs or act in contradiction to them, and forces Plaintiff to choose between the teachings and requirements of his sincerely held religious beliefs in the commands of Scripture and the government's imposed value system.

154. Defendants' Inclusivity Policy, on its face and as applied, places Plaintiff in an irresolvable conflict between compliance with the Inclusivity Policy and his sincerely held religious beliefs.

155. Defendants' Inclusivity Policy, on its face and as applied, puts substantial pressure on Plaintiff to violate his sincerely held religious beliefs or face loss of his ability to feed his family.

156. Defendants' Inclusivity Policy, on its face and as applied, specifically targets Plaintiff's religious beliefs for disparate and discriminatory treatment.

157. Defendants' Inclusivity Policy, on its face and as applied, constitutes a substantial burden on Plaintiff's exercise of his sincerely held religious beliefs.

158. Defendants' Inclusivity Policy, on its face and as applied, constitutes a substantial burden on Plaintiff's exercise of his sincerely held religious beliefs because it forces him to make the unconscionable choice between violating his sincerely held religious convictions or facing termination.

159. Defendants' Inclusivity Policy, on its face and as applied, fails to accommodate Plaintiff's sincerely held religious beliefs.

160. Defendants' Inclusivity Policy, on its face and as applied, is not supported by any compelling, legitimate, substantial, or even rational government interest.

161. Defendants' Inclusivity Policy, on its face and as applied, is not the least restrictive means of achieving an otherwise permissible government interest.

162. Defendants' Inclusivity Policy, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Plaintiff's sincerely held religious beliefs.

163. Plaintiff has no adequate remedy at law for the continuing deprivation of his religious-exercise rights under PRFA and the First and Fourteenth Amendments.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT VI
### VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

164. Plaintiff re-alleges and incorporates by reference each allegation set forth in paragraphs 1-68.

165. The Free Exercise Clause of the First Amendment, as incorporated against the States through the Fourteenth Amendment, prohibits Defendants from abridging Luke's right to freely exercise his religion.

166. "The Free Exercise Clause of the First Amendment protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 778 (2022) (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 450 (1988)).

167. The Free Exercise Clause prohibits the government from acting with hostility toward religious beliefs or practices and protects against both overt and covert discrimination based on religious status or beliefs. *See Masterpiece Cakeshop, Ltd. v. Colo. Rights Comm'n*, 584 U.S. 617, 638 (2018); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

168. The Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly" but "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).

169. Defendants' Inclusivity Policy, on its face and as applied, targets Plaintiff's sincerely held religious beliefs for disparate and discriminatory treatment, solely on the basis of their religious nature.

170. Defendants' Inclusivity Policy, on its face and as applied, impermissibly burdens Plaintiff's sincerely held religious beliefs, compels Plaintiff to either change those beliefs or act in contradiction to them, and forces Plaintiff to choose between

the teachings and requirements of his sincerely held religious beliefs in the commands of Scripture and the government's imposed value system.

171. Defendants' Inclusivity Policy, on its face and as applied, places Plaintiff in an irresolvable conflict between compliance with the Policy and his sincerely held religious beliefs.

172. Defendants' Inclusivity Policy, on its face and as applied, puts substantial pressure on Plaintiff to violate his sincerely held religious beliefs or face loss of his ability to feed his family.

173. Defendants' Inclusivity Policy, on its face and as applied, is neither neutral nor generally applicable.

174. Defendants' Inclusivity Policy, on its face and as applied, specifically targets Plaintiff's religious beliefs for disparate and discriminatory treatment.

175. Defendants' Inclusivity Policy, on its face and as applied, specifically targets religion for disparate and discriminatory treatment.

176. Defendants' Inclusivity Policy, on its face and as applied, creates a system of individualized exemptions for preferred value systems while discriminating against sincerely held religious beliefs.

177. Defendants' Inclusivity Policy, on its face and as applied, constitutes a religious gerrymander by unconstitutionally orphaning sincerely held religious beliefs while permitting the more favored nonreligious value systems.

178. Defendants' Inclusivity Policy, on its face and as applied, constitutes a substantial burden on Plaintiff's exercise of his sincerely held religious beliefs.

35

179. Defendants' Inclusivity Policy, on its face and as applied, fails to accommodate Plaintiff's sincerely held religious beliefs.

180. Defendants' Inclusivity Policy, on its face and as applied, is not supported by any compelling, legitimate, substantial, or even rational government interest.

181. Defendants' Inclusivity Policy, on its face and as applied, is not the least restrictive means of achieving an otherwise permissible government interest.

182. Defendants' Inclusivity Policy, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Plaintiff's sincerely held religious beliefs.

183. Plaintiff has no adequate remedy at law to protect the continuing deprivation of his most cherished constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT VII
### Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution

184. Plaintiff re-alleges and incorporates by reference each allegation set forth in paragraphs 1-68.

185. The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the right to equal protection under the law.

186.    "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

187.    The Equal Protection Clause prohibits discrimination on the basis of religion.

188.    Defendants' Inclusivity Policy, on its face and as applied, is an unconstitutional abridgment of Plaintiff's right to equal protection under the law, is not neutral, and specifically targets Plaintiff's sincerely held religious beliefs for discriminatory and unequal treatment.

189.    Defendants' Inclusivity Policy, on its face and as applied, is an unconstitutional abridgement of Plaintiff's right to equal protection because it permits Defendants to treat Plaintiff differently from other similarly situated employees on the basis of Plaintiff's sincerely held religious beliefs.

190.    Defendants' Inclusivity Policy, on its face and as applied, singles out Plaintiff for selective treatment based upon his sincerely held religious beliefs.

191.    Defendants' Inclusivity Policy, on its face and as applied, is explicitly intended to inhibit and punish the exercise of Plaintiff's sincerely held religious beliefs.

192.    Defendants' Inclusivity Policy, on its face and as applied, creates a system of classes and categories that permit the government to exclude other

37

employees with sincerely held religious beliefs, such as Plaintiff, from gaining or maintaining employment there.

193. Defendants' Inclusivity Policy, on its face and as applied, by categorically excluding religious employees from employment, has created and singled out a specific class of people as compared to similarly situated employees with no religious convictions.

194. Defendants' Inclusivity Policy, on its face and as applied, is a "status-based enactment divorced from any factual context" and "a classification of persons undertaken for its own sake," which "the Equal Protection Clause does not permit." *Romer v. Evans*, 517 U.S. 620, 635 (1996).

195. Defendants' Inclusivity Policy, on its face and as applied, "identifies persons by a single trait [religious beliefs] and then denies them protections across the board." *Id.* at 633.

196. Defendants' Inclusivity Policy, on its face and as applied, results in a "disqualification of a class of persons from the right to seek specific protection [for their religious beliefs]." *Id.*

197. Defendants' Inclusivity Policy, on its face and as applied, "declar[es] that in general it shall be more difficult for one group of citizens than for all others to seek [certain status] from the government is itself a denial of equal protection of the laws in the most literal sense." *Id.*

198. Defendants' Inclusivity Policy, on its face and as applied, discriminates between religion and nonreligion by allowing certain, nonreligious employees the

38

ability to attain and retain employment while categorically excluding similarly situated employees from the same treatment, and does so solely on the basis of religious belief.

199. Defendants' Inclusivity Policy, on its face and as applied, "raises the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected," *id.* at 634, and thus violates the Equal Protection Clause.

200. Defendants' Inclusivity Policy, on its face and as applied, is not supported by any compelling, legitimate, substantial, or even rational government interest.

201. Defendants' Inclusivity Policy, on its face and as applied, is not the least restrictive means of achieving an otherwise permissible government interest.

202. Defendants' Inclusivity Policy, on its face and as applied, is not narrowly tailored to achieve any such legitimate government interests, even if such interests existed.

203. Defendants' Inclusivity Policy, on its face and as applied, lacks any rational basis and are irrational and unjustifiable.

204. Defendants' Inclusivity Policy, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue damages on Plaintiff's sincerely held religious beliefs.

205. Plaintiff has no adequate remedy at law to protect the continuing deprivation of his most cherished constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as follows:

A.    That the Court enter a Permanent Injunction upon judgment, restraining and enjoining Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the Defendants' discriminatory and unlawful Inclusivity Policy; compelling Defendants to reinstate Plaintiff to his previous position with all the rights, privileges, and benefits appertaining thereto; and compelling Defendants to reasonably accommodate the religious beliefs and practices of its employees, including Plaintiff, in accordance with the mandates of Title VII, as elucidated by the Supreme Court of the United States in *Groff v. DeJoy*, 600 U.S. 447 (2023);

B.    That the Court render a Declaratory Judgment against Defendants, declaring that Defendants' Inclusivity Policy is unconstitutional on its face and as applied to Plaintiff, and further declaring that Defendants' Inclusivity Policy, on its face and as applied,

1.    violates the First Amendment's prohibition on compelled speech and is unconstitutionally viewpoint and content based by attempting to compel

40

speech that violates the speaker's sincerely held religious beliefs and conscience;

2.    violates the Free Exercise Clause of the First Amendment specifically targeting Plaintiff's sincerely held religious beliefs for disparate and discriminatory treatment;

3.    violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by codifying into law a preference for employees with specific religious beliefs; and

4.    violates the Louisiana Preservation of Religious Freedom Act.

C.    That the Court render a Declaratory Judgment against Defendants, declaring that Defendants' termination of Plaintiff's employment was unconstitutional and unlawful, and further declaring that:

1.    Defendants violated Title VII by failing to reasonably accommodate Plaintiff's sincerely held and bona fide religious beliefs;

2.    Defendants violated Title VII by intentionally discriminating against Plaintiff for his sincerely held and bona fide religious beliefs; and

3.    Defendants violated Title VII by wrongfully terminating Plaintiff for his sincerely held religious beliefs when accommodating his belief would not cause Defendants an undue burden.

D.    That the Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment;

E.      That the Court restore Plaintiff to the status quo ante- that is, reinstate him as a Library Technician I and restore all benefits, rank, status, and privileges appertaining thereto;

F.      That the Court award Plaintiff backpay and other actual damages in an amount to be determined at trial by a jury;

G.      That the Court award Plaintiff punitive damages;

H.      Judgment declaring Defendants' Inclusivity Policy unconstitutionally discriminatory, both on its face and as applied to Plaintiff;

I.      That the Court award Plaintiff his reasonable attorney's fees, costs, and other expenses and disbursement in this action under 42 U.S.C. §1988, 42 U.S.C. §2000e-5(k), and PRFA;

J.      That the Court retain jurisdiction over the matter for the purposes of enforcing the Court's order and final judgment; and

K.      That the Court grant such other and further relief as the Court deems equitable and just under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Luke demands a jury trial on all triable issues.

Dated this 9th Day of July in the Year of our Lord, 2026.

Respectfully submitted,

| | |
|---|---|
| /s/ Michael DuBos | /s/ Avery Hill |
| Michael L. DuBos | Mathew D. Staver* |
| Breithaupt, DuBos, & Wolleson, LLC | Horatio G. Mihet* |
| 1811 Tower Drive, Suite D | Daniel J. Schmid* |
| Monroe, LA 71201 | Avery B. Hill* |
| (318) 322-1202 | LIBERTY COUNSEL |
| michael@bdw.law | P.O. Box 540774 |
| | Orlando, Florida 32854 |
| | Phone: (407) 875-1776 |
| | Fax: (407) 875-0770 |
| | Email: court@lc.org |
| | hmihet@lc.org |
| | dschmid@lc.org |
| | ahill@lc.org |
| | *Attorneys for Plaintiff* |
| | *Applications for Admission Pending |

43

## <u>VERIFICATION</u>

I, Luke Ash, am over the age of eighteen years and the plaintiff in this action. The statements and allegations that pertain to me or which I make in this Verified Complaint are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury of the laws of the United States and the State of Louisiana that the foregoing statements are true and correct to the best of my knowledge.

Dated this 9th day of July, 2026

/s/ Luke Ash

Luke Ash